IN THE UNITED STATES DISTRICT COURT
FOR THE STERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| VINCENTA NORRIS and CHARLES D. NORRIS (as Representative of the Estate of Jimmy E. Norris), | § § § § | |
| PLAINTIFFS | § § | |
| *versus* | § § | CIVIL ACTION NO. 2:21-cv-00476 |
| | § | |
| UNITED STATES PRECIOUS METALS, LLC, SPINDLETOP COINS, INC., and NATHAN CAMP | § § § § | |
| DEFENDANTS | § § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

**TO THE HONORABLE UNITED STATES DISTRICT COURT:**

Plaintiffs Vinceta Norris and Charles D. Norris (as Personal Representative of the Estate of Jimmy E. Norris) ("Norris" or "Plaintiff") files this their Original Complaint complaining of the actions of Defendants United States Precious Metals LLC, Spindletop Coins, Inc., and Nathan Camp (together, "Defendants"), respectfully shows the following:

## NATURE OF THE CASE

**1.**     This action is brought under 18 U.S.C. §§ 1961-1968 (Racketeer Influenced and Organized Crime Act and Texas common law by Vinceta Norris and Charles D. Norris (as Personal Representative of the Estate of Jimmy E. Norris) ("Norris") against Nathan Camp (RICO Defendant) ("CAMP") operating by and through United States Precious Metals LLC ("USPM") (RICO Enterprise) and  Spindletop Coins, Inc., ("SCI") (RICO Enterprise) (collectively "RICO-

AIF Enterprises"), for their unlawful, false, misleading and unconscionable misrepresentations and sales tactics, that resulted in direct damages to Plaintiffs Vinceta Norris and Charles D. Norris (as Personal Representative of the Estate of Jimmy E. Norris) in the amount of approximately One Hundred Two Thousand, Six Hundred Ninety-Five and 00/100 Dollars ($102,695.00) from the purchase of coins that are not worth the value at which they were purchased and will never attain the value as claimed or return on investment as represented. Norris seeks recovery of actual damages, consequential damages, punitive damages, statutory treble damages, pre- and post-judgment interest, attorneys' fees, litigation expenses and costs of suit.

## RICO DEFENDANT - NATHAN CAMP

**2.**     NATHAN CAMP (RICO Defendant) conducted and/or participated in concert with in the business and financial affairs of the RICO Enterprises USPM and SCI and the RICO-AIF Enterprises through a pattern of racketeering activity; to wit: CAMP participated, directly and indirectly with others, and together they acted by and through various employees, representatives and entities, to engage in repeated and systematic mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341; 1343 that generated multiple and repeated fraudulent and unlawful coin sales to NORRIS that, in turn, generated exorbitant compensation for the CAMP.  CAMP caused USPM (RICO Enterprise) and SCI (RICO Enterprise) to use the interstate mails and wires to repeatedly make and/or send fraudulent coin solicitations, sales receipts and/or other purchase confirmations to NORRIS.

**3.**     By his unlawful acts, CAMP (i) conducted and/or participated in the affairs of USPM and SCI, each as a RICO Enterprise and collectively as the RICO-AIF Enterprises, (in violation of 18 U.S.C. § 1962(c)) and/or (ii) conspired to violate 18 U.S.C. § 1962(b) and(c) (in violation of 18

U.S.C. §1962(d)), and defrauded the elderly Norris couple in the process.   Nathan Camp committed these substantive RICO offenses by causing USPM (RICO Enterprise) and SCI (RICO Enterprise) each and in concert with each other as RICO-AIF Enterprises, to engage in multiple predicate acts of mail fraud and wire fraud—all the while knowing of, and agreeing to, the overall objective of such fraud; to wit: generating exorbitant compensation for himself and possibly others unknown at this time.   Nathan Camp knew that making and/or sending fraudulent solicitations, sales receipts and/or purchase confirmations to NORRIS was fraudulent, misleading and unlawful. Nathan Camp knew such wrongful acts and practices would generate multiple and repeated unlawful coin sales to NORRIS that, in turn, would generate exorbitant compensation for himself. Nathan Camp engaged in the scheme to take unfair advantage of NORRIS. Nathan Camp's wrongful acts proximately and/or directly caused NORRIS to be substantially overcharged for the coins.

## JURISDICTION AND VENUE

**4.**    This Court has subject matter jurisdiction over Vinceta Norris and Charles D. Norris (as Personal Representative of the Estate of Jimmy E. Norris) claims pursuant to (i) 28 U.S.C. § 1332(a) because the matter in controversy exceeds $75,000, exclusive of interest and costs, and the Parties are citizens of different states (diversity), and (ii) 28 U.S.C. § 1367 (supplemental jurisdiction). This Court also has *in personam* jurisdiction over Defendants because at all relevant times, Defendants resided, maintained citizenship, were found, had agents, conducted business and/or sold the coins at issue in this case to NORRIS in and/or from the Eastern District of Texas.

**5.**    Venue is proper in the Eastern District of Texas pursuant to 28 U.S.C § 1391(a) because, at all relevant times, Defendants resided, were found, had agents and/or conducted business in the

Eastern District of Texas.  Defendants sold the numismatic and bullion coins at issue in this case to NORRIS in and/or from the Eastern District of Texas.  A substantial part—if not all—of Defendants' wrongful acts and omissions occurred in the Eastern District of Texas. The corporate defendants all maintain their principal place of business in the Eastern District of Texas.

## PARTIES

6.   **PLAINTIFFS VINCENTA NORRIS AND CHARLES D. NORRIS (AS PERSONAL REPRESETATIVE OF THE ESTATE OF JIMMY E. NORRIS)** ("NORRIS") are citizens and residents of Richmond, Missouri.

7.   **DEFENDANT NATHAN CAMP** ("Camp") is a citizen and resident of Beaumont, Jefferson County, Texas.  He may be served at his last known residence at 6470 Clayborn Drive, Beaumont, Texas 77706-7281 or at his normal place of business at either 990 I-10 North, Suite 102, Beaumont, Texas 77702 or 4220 Treadway, Beaumont, Texas 77706. Service is not requested at this time, as waiver of service under Fed. R. Civ. Proc., Rule 4(d) is being attempted.

8.   **DEFENDANT UNITED STATES PRECIOUS METALS LLC,** (USPM) is a private corporation organized under the State of Texas with its principal place of business located in Jefferson County, Texas.  It can be served through its agent of service, Mr. Nathan Camp, at the registered office at 990 I-10 North, Suite 102, Beaumont, Texas 77702 or 4220 Treadway, Beaumont, Texas 77706. Service is not requested at this time.  Service is not requested at this time, as waiver of service under Fed. R. Civ. Proc., Rule 4(d) is being attempted.

4

9.     **DEFENDANT SPINDELTOP COINS, INC.,** ("SCI") is a private corporation organized under the State of Texas with its principal place of business located in Jefferson County, Texas. It can be served through its agent of service, Mr. Nathan Camp, at the registered office at 990 I-10 North, Suite 102, Beaumont, Texas 77702 or 4220 Treadway, Beaumont, Texas 77706. Service is not requested at this time. Service is not requested at this time, as waiver of service under Fed. R. Civ. Proc., Rule 4(d) is being attempted.

## FACTUAL BACKGROUND

10.     The Defendants operate a sales and telemarketing operation for the purpose of selling collectible numismatic, semi-numismatic, and bullion coins[1] directly to consumers over the telephone and via the internet. Defendants themselves and through various employees make thousands of intrastate and interstate sales calls per month — via the telephone — and ship these coins by the interstate mails and private interstate delivery services. Defendants, using various unscrupulous techniques, "upsell" coins at inflated prices and continue their sham until the customer runs out of money, tires of buying coins, or discovers the true value of the fraudulently priced coins.  This tactic has been condemned by the United States Senate, the Federal Trade Commission, various States' Attorneys General and States' Security commissions. Precious metal fraud investigation by the United States Senate Special Committee on Aging revealed that the "overwhelming number of victims in precious metal fraud are seniors."[2]  The Senate Special Committee also conservatively estimates that more than "10,000 Americans have been

---

[1] The term "*numismatic*" refers to collectible coins whose value is based upon qualities other than the metal content of the coin, such as appearance, population, grade, rarity, and other attributes.  "*Semi-numismatic*" refers to coins whose value partially derives from their numismatic value and partially from the value of the precious metal content.  *Bullion* coins derive their value almost entirely from the fair market value of the precious metal content.

[2] *See Exploring the Perils of the Precious Metals Market*, United States Senate Special Committee on Aging, Summary of Committee Staff Investigation,
*https://www.aging.senate.gov/download/precious-metals-market-committee-staff-investigation,* at 16.

victimized through these schemes, with losses around $300 million."[3]   These Defendants utilize one or more of the following unlawful, false, misleading and unconscionable sales tactics:

    a)  Misrepresenting attributes of graded bullion to move customers from bullion to the over-price coins;

    b)  Misrepresenting qualities of the coins with promises that the investment in certified coins will substantially appreciate, all the while increasing the population of "certified coins" with sales to others;

    c)  offering a short term "money back guarantee" which provides no real opportunity to investigate the true value of the coins;

    d)  advising customers to purchase unique bullion coins, when the coins are not unique;

    e)  misrepresenting to customers that "certified coins" will outperform other types of investments—without any specific underlying data supporting such assertions;

    f)  Using grading and marketing to deceptively sell bullion as some type of "modern numismatics," even though there are very large populations of the high-grade coins and/or the "certification" is commonly duplicated with minor expense;

    g)  Claiming a volatile market based upon the spot price of gold yet selling bullion coins at such exorbitant and fraudulent prices to make "market price" nothing but a gimmick;

    h)  Misrepresenting the value of numismatic coins;

    i)  Using various companies as intermediaries to drive the price of the coin to fraudulent levels;

    j)  Failing to display, disclose, or file required information regarding telephone solicitations; and,

    k)  various other acts and practices that may be uncovered during discovery.

**11.**   Jimmy and Vincenta Norris were an elderly couple in their late 70s when, beginning it May 2017, they were enticed by the Defendants to purchase coins.  They confessed to the Defendants that they knew nothing about precious metals or numismatics.  Over the next approximately two (2) years, the Defendants engaged in numerous personal conversations to learn more of their interests and establish a rapport; thus, began the financial exploitation of the elderly Norris

---

[3] *Id.* at 17.

couple that can only be described as a cruel form of elder abuse.  Defendants were very effective in targeting and inducing the elderly Norris couple to "invest" a sizeable portion of their life savings in over-priced coins. Defendants mislead the elderly Norris couple and enticed them into believing the "historical coins" "certified coins" and "graded modern bullion"[4] were a sound investment, that they were getting "good deals," the coins would retain their value, and that the coins were unique and/or rare. Defendants failed to advise the elderly Norris couple that they were paying substantially more than the fair market price of for the coins, and incurring immediate and substantial losses with each transaction. Over the course of two years, involving nineteen (19) transactions, Defendants convinced the elderly Norris couple to purchase coins in the amount of at least One Hundred Fifty-five Thousand, Seven Hundred Thirty-five and 00/100 Dollars ($155,735.00).  Those purchases were for grossly overpriced coins that resulted in a loss of One Hundred Two Thousand, Six Hundred Ninety-five and 00/100 Dollars ($102,695.00), to wit:

**11.1**    On 5/30/2017, Defendants convinced Plaintiffs through misrepresentations as to the value and quality of the coins to purchase Five (5) 1986 $1 Silver American Eagles MS69 for $1,450.00 as a sound and safe investment. The fair market value of the coins was just $200.00, resulting in an immediate and unconscionable monetary loss to Plaintiff of $1,250.00, with a markup of 625%, an amount that is fraudulent.

---

[4]  The coin's grade is a numerical value, commonly referred to as the *Sheldon scale* that ranges between 1 and 70. The most valuable coins are uncirculated coins, commonly referred to as mint state (MS) and designated with grades from 60 to 70.  Thus, a coin with a grade MS-70 is a perfect coin in original, uncirculated condition.  PF-70, also PR-70, is a reference to "Proof 70", is another term to signify the coin has flawless characteristics but that the mint was intended for collectors. It is not a higher grade than MS-70 (Mint State 70), which is the highest grade for general circulation. The numerical grade is assigned based on a number of attributes, such as luster (i.e. shininess), strike (i.e. how well the mint connected with the blank coin in manufacturing), and color (i.e. the dye variations used in striking the coin). The grades are assigned for a nominal fee by independent grading services. The industry considers the premier professional grading services to be Numismatic Guaranty Corporation (NGC) and Professional Coin Grading Services (PCGS).

**11.2**   On 5/30/2017, Defendants convinced Plaintiffs through misrepresentations as to the value and quality of the coins to purchase Ten (10) 1986 $1 Silver American Eagles MS69 for $2,900.00 as a sound and safe investment. The fair market value of the coins was just $400.00, resulting in an immediate and unconscionable monetary loss to Plaintiff of $2,500.00, with a markup of 625%, an amount that is fraudulent.

**11.3**   On 5/30/2017, Defendants convinced Plaintiffs through misrepresentations as to the value and quality of the coins to purchase Five (5) 1986 $1 Silver American Eagles MS69 for $1,445.00 as a sound and safe investment. The fair market value of the coins was just $200.00, resulting in an immediate and unconscionable monetary loss to Plaintiff of $1,245.00, with a markup of 623%, an amount that is fraudulent.

**11.4**   On 9/27/2017, Defendants convinced Plaintiffs through misrepresentations as to the value and quality of the coins to purchase Two (2) 1986 $25 Gold American Eagles MS69 for $3,850.00 as a sound and safe investment. The fair market value of the coins was just $1450.00, resulting in an immediate and unconscionable monetary loss to Plaintiff of $2,400.00, with a markup of 166%, an amount that is fraudulent.

**11.5**   On 9/27/2017, Defendants convinced Plaintiffs through misrepresentations as to the value and quality of the coins to purchase Twenty (20) 1986 $1 Silver American Eagles MS69 for $5,800.00 as a sound and safe investment. The fair market value of the coins was just $800.00, resulting in an immediate and unconscionable monetary loss to Plaintiff of $5,000.00, with a markup of 625%, an amount that is fraudulent.

**11.6**   On 10/20/2017, Defendants convinced Plaintiffs through misrepresentations as to the value and quality of the coins to purchase Five (5) 2017 $25 Pallaidum american Eagle High Relief MS70 for $14,450.00 as a sound and safe investment. The fair

market value of the coins was just $6,500.00, resulting in an immediate and unconscionable monetary loss to Plaintiff of $7,950.00, with a markup of 122%, an amount that is fraudulent.

11.7    On 12/21/2017, Defendants convinced Plaintiffs through misrepresentations as to the value and quality of the coins to purchase Twenty-Six (26) 1986 $1 Silver American Eagle MS69 for $6,760.00 as a sound and safe investment. The fair market value of the coins was just $1,040.00, resulting in an immediate and unconscionable monetary loss to Plaintiff of $5,720.00, with a markup of 550%, an amount that is fraudulent.

11.8    On 12/21/2017, Defendants convinced Plaintiffs through misrepresentations as to the value and quality of the coins to purchase a kit of twenty-two (22) Silver American Eagles MS69 with dates from 1987-2009 for $2,940.00 as a sound and safe investment. The fair market value of the coins was just $700.00, resulting in an immediate and unconscionable monetary loss to Plaintiff of $2,240.00, with a markup of 320%, an amount that is fraudulent.

11.9    On 2/2/2018, Defendants convinced Plaintiffs through misrepresentations as to the value and quality of the coins to purchase Five (5) 2018 $50 Gold Buffalo MS70 for $14,450.00 as a sound and safe investment. The fair market value of the coins was just $7,500.00, resulting in an immediate and unconscionable monetary loss to Plaintiff of $6,950.00, with a markup of 93%, an amount that is fraudulent.

11.10    On 2/16/2018, Defendants convinced Plaintiffs through misrepresentations as to the value and quality of the coins to purchase One (1) 1998 $25 Gold American Eagle MS70 for $7,500.00 as a sound and safe investment. The fair market value of the

coins was just $2,000.00, resulting in an immediate and unconscionable monetary loss to Plaintiff of $5,500.00, with a markup of 275%, an amount that is fraudulent.

**11.11** On 4/4/2018, Defendants convinced Plaintiffs through misrepresentations as to the value and quality of the coins to purchase Twenty (20) 1986 $1 Gold American Eagle MS69 for $5,800.00 as a sound and safe investment. The fair market value of the coins was just $800.00, resulting in an immediate and unconscionable monetary loss to Plaintiff of $5,000.00, with a markup of 625%, an amount that is fraudulent.

**11.12** On 6/1/2018, Defendants convinced Plaintiffs through misrepresentations as to the value and quality of the coins to purchase Twenty (20) $1 Morgan Silver Dollar- MS62 -Years of our Choice for $7,000.00 as a sound and safe investment. The fair market value of the coins was just $1,100.00, resulting in an immediate and unconscionable monetary loss to Plaintiff of $5,900.00, with a markup of 536%, an amount that is fraudulent.

**11.13** On 8/15/2018, Defendants convinced Plaintiffs through misrepresentations as to the value and quality of the coins to purchase Twenty (20) 1986 $1 Silver American Eagle MS69 for $5,600.00 as a sound and safe investment. The fair market value of the coins was just $800.00, resulting in an immediate and unconscionable monetary loss to Plaintiff of $4,800.00, with a markup of 600%, an amount that is fraudulent.

**11.14** On 10/10/2018, Defendants convinced Plaintiffs through misrepresentations as to the value and quality of the coins to purchase Ten (10) 1901-S $10 Coronet Liberty Gold- MS63 for $22,500.00 as a sound and safe investment. The fair market value of the coins was just $8,500.00, resulting in an immediate and unconscionable monetary loss to Plaintiff of $14,000.00, with a markup of 165%, an amount that is fraudulent.

**11.15**   On 11/30/2018, Defendants convinced Plaintiffs through misrepresentations as to the value and quality of the coins to purchase Five (5) 2018 $25 Gold American Eagle - Gold Foil Label-DCOE Black Core  MS69 for $9,000.00 as a sound and safe investment. The fair market value of the coins was just $2,500.00, resulting in an immediate and unconscionable monetary loss to Plaintiff of $6,500.00, with a markup of 260%, an amount that is fraudulent.

**11.16**   On 2/28/2019, Defendants convinced Plaintiffs through misrepresentations as to the value and quality of the coins to purchase Ten (10) 2017  $1 Silver American Eagle Red White Blue Mint Release Series-MS69 for $3,900.00 as a sound and safe investment. The fair market value of the coins was just $400.00, resulting in an immediate and unconscionable monetary loss to Plaintiff of $3,500.00, with a markup of 875%, an amount that is fraudulent.

**11.17**   On 3/19/2019, Defendants convinced Plaintiffs through misrepresentations as to the value and quality of the coins to purchase Ten (10) 2000 $1 Silver American Eagle MS69 for $3,900.00 as a sound and safe investment. The fair market value of the coins was just $350.00, resulting in an immediate and unconscionable monetary loss to Plaintiff of $3,550.00, with a markup of 1014%, an amount that is fraudulent.

**11.18**   On 5/3/2019, Defendants convinced Plaintiffs through misrepresentations as to the value and quality of the coins to purchase One (1) 1986-2019 Silver American Eagle MS69 (24 coins) for $3,490.00 as a sound and safe investment. The fair market value of the coins was just $800.00, resulting in an immediate and unconscionable monetary loss to Plaintiff of $2,690.00, with a markup of 336%, an amount that is fraudulent.

**11.19**   On 6/26/2019, Defendants convinced Plaintiffs through misrepresentations as to the value and quality of the coins to purchase Ten (10) 1908 Gold $20 No Motto St.Gaudens MS64 for $33,000.00 as a sound and safe investment. The fair market value of the coins was just $17,000.00, resulting in an immediate and unconscionable monetary loss to Plaintiff of $16,000.00, with a markup of 94%, an amount that is

**15.**   Once Defendants convinced NORRIS to purchase the above-listed coins[5] using the interstate wires, NORRIS used the interstate wires and/or postal service to transfer funds directly to USPM and/or SCI to pay for the coins.   The Defendants then sent the fraudulently misrepresented coins, along with sales receipts, to NORRIS in Missouri via the interstate mails or private interstate carriers. Thus, for each coin purchase, NORRIS received a sales receipt from the Defendants "after the fact;" meaning, after—not before—he paid for each coin purchase, he received a sales receipt from Defendants listing the coins he purchased.   Plaintiff utilized interstate phone and wire services to confirm the transactions on the coin purchases listed above. The Defendants routinely used the United States Postal Service and other interstate delivery services to deliver the coins and consummate the fraudulent activity.

**16.**   In July 2019, Jimmy E, Norris died at the age of 82 and his son Charles Norris was appointed the personal representative of the estate.   In early 2020, Charles Norris was preparing an evaluation of the estate and contacted the Defendants representative Matt Romero to seek a return of the coins.   Romero claimed that the coins were a great investment and that the Plaintiffs should keep them for three to five years before the value will "double." Charles Norris continued to call Matt Romero and Adrian Miranda numerous times over the next several months. They stalled and misdirected Charles Norris with numerous sales pitches.   Finally, Charles Norris

---

[5] A tabulation of the fraudulent transactions by the Defendants is attached as Exhibit 1 to this Complaint.

received a print out of "values" of the coins from Adrian Miranda, so he requested that Defendants buy the coins back at their "valued" price.  The Defendants continued to stall and misdirect Charles Norris until he reasonably concluded that the Defendants would never buy the coins back. Charles Norris then began to seek to sell them to other coin dealers and discovered the that his parents may have been victimized by the Defendants.

**16.**     In Surprised at the initial evaluation, he had a subsequent appraisal performed by Paul Montgomery, a professional numismatists and appraiser[6] determined that, at the moment The elderly Norris couple purchased the coins, The elderly Norris couple incurred an immediate loss of One Hundred Two Thousand, Six Hundred Ninety-five and 00/100 Dollars ($102,695.00). Contrary to what the elderly Norris couple were led to believe by Defendants' representations, the actual value of the coins on the day of purchase was only Fifty-Thee Thousand Forty and 00/100 Dollars ($53,040.00). The Defendants sold coins to the elderly Norris couple that were routinely over 500% markup, and some over 1000% markup, well above the "fraud" line established by the Texas Attorney General.[7] The widow Vincenta Norris couple will never recover their initial investment, much less realize any profit. The elderly Norris couple incurred actual damages of One Hundred Fifty-five Thousand, Seven Hundred Thirty-five and 00/100 Dollars ($155,735.00); and, consequential damages of approximately Eight Thousand, Five Hundred Fifty-two and 33/100 Dollars ($8,552.33) in market gains.[8]  The above-listed coins were not worth the prices the elderly Norris couple paid for them when they were purchased, and they

---

[6] Paul Montgomery is a nationally recognized expert utilized by numerous Federal and State agencies. Montgomery is a retained expert in this case.

[7] The Texas Attorney General established guidelines indicating gold coin selling for over 100% markups are fraudulent. *See* the Texas Attorney General Gold Coins Fact Sheet Advisory, April 2017 *https://www.texasattorneygeneral.gov/files/cpd/17084_gold-coins_factsheet.pdf*

[8] Attached as Exhibit 2 is a tabulation of the consequential damages calculated as the losses incurred by The elderly Norris couple by taking the difference between the value of the bullion coins (spot price) when purchased and the value of the bullion coins (spot price) as of June 16, 2020.

have not attained such value to date nor provided the safe haven or return on investment as promised by Defendants.

17.      Defendants and their employees utilized unlawful, false, misleading and unconscionable high-pressure sales tactics to convince the elderly Norris couple to purchase the grossly overvalued coins by, *inter alia*, knowingly, intentionally and falsely representing:

(a)   the current value of the coins with full knowledge that the coins were not worth the value at which they were purchased and will never provide the return of investment as represented;

(b)   Failing to disclose that the fair market value of the "certified coins" was substantially less than the amount paid;

(c)   Misleading the elderly Norris couple into believing that Defendants wanted to assist them in making sound investments;

(d)   Misleading the elderly Norris couple as to the performance of "certified" bullion coins; and,

(e)   Misrepresenting attributes of graded bullion ("certified coins") to move the elderly Norris couple from bullion to the over-price coins;

(f)   Misrepresenting qualities of the coins with promises that the investment in certified coins will substantially appreciate;

(g)   Advising the elderly Norris couple to purchase unique bullion coins, when the coins are not unique;

(h)   Misrepresenting to customers that "certified coins" will outperform other types of investments—without any specific underlying data supporting such assertions;

(i)   Using grading and marketing to deceptively sell bullion as some type of "modern numismatics," even though there are very large populations of the high-grade coins and/or the "certification" is commonly duplicated with minor expense;

(j)   Misrepresenting the market value of "certified coins" on their website to prevent or delay consumers from determining the actual market price of bullion coins.

(k)   Misrepresenting the value of numismatic coins;

(l)   Misrepresenting the fair market value of its proof and commemorative coins the prices are significantly higher than bullion coins containing the same amount of gold.

14

(m) Misrepresenting the market value of coins when, in fact, the Defendants' market represents nothing more than a Ponzi scheme where the Defendants must continue to get more fraudulent and higher prices to support their own claims of rising values to convince prospective customers of returns on investments when such returns are illusory;

(n) Using various related companies as intermediaries to drive the price of the coin to fraudulent levels;

(o) Misrepresenting market value based not on independent reliable sources but based upon prices obtained through their fraudulent sales tactics;

(p) Failing to display, disclose, or file required information under the Texas Telephone Solicitation Act regarding telephone solicitations; and,

(q) Performing other acts of deception, fraudulent business practices and misrepresentation that may be discovered during the course of this litigation.

18.     The sales of over-priced coins to the elderly Norris couple are neither isolated incidents nor unique to the elderly Norris couple.  Using these fraudulent tactics, these Defendants have sold millions of dollars of over-priced coins to thousands of other consumers for over ten years, indicating a continuing open-ended scheme and pattern of fraudulent conduct.  On information and belief, these customers individuals live in other states where defendants must use the interstate mail and wires to perpetrate these frauds as part of the routine course of USPM (RICO enterprise), SCI (RICO enterprise), and the RICO-AIF businesses.

19.     As a direct and/or proximate result of Defendants' above wrongful acts and practices, the widow Vincenta Norris suffered (and continues to suffer) substantial economic damages, which Defendants refuse to remedy.  This case has resulted.

## CLAIMS FOR RELIEF/CAUSES OF ACTION

### COUNT I
### MAIL FRAUD AND WIRE FRAUD
### A Pattern of Unlawful Activity Under 18 U.S.C. § 1961, *Et Seq.*
### (as against RICO Defendant CAMP)

**20.**     The preceding factual statements and allegations are incorporated by reference.

**21.**     By engaging in the above-described open-ended scheme to defraud the elderly Norris couple—that also was a consistent, regular and dominant part of the manner in which the RICO Defendant Nathan Camp ("Camp") participated in and conducted the day-to-day business affairs of the RICO Enterprises and RICO-AIF Enterprise — the Defendants instigated, perpetrated and executed a scheme to defraud the elderly Norris couple; to wit, the RICO Defendant CAMP, individually or in concert, and by or through representatives and employees of the RICO Enterprises (USPM and/or SCI) and the RICO-AIF, engaged in repeated and systematic mail fraud and wire fraud (as described above) in violation of 18 U.S.C. §§ 1341; 1343 that generated multiple and repeated unlawful coin sales to the elderly Norris couple (as described above) that, in turn, generated exorbitant compensation for them.  The RICO Defendant caused the RICO and RICO-AIF enterprises to use the interstate mails and wires to repeatedly make and/or send fraudulent solicitations, sales receipts and/or purchase confirmations to the elderly Norris couple for the above-described coin transactions.  As such, the RICO Defendant conducted and/or participated in the business and financial affairs of the RICO and RICO-AIF Enterprises through a pattern of racketeering activity (to wit, repeated and systematic mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341; 1343) (as described above) that generated multiple and repeated unlawful coin sales to the elderly Norris couple that, in turn, generated exorbitant compensation for them.  The RICO Defendant committed these substantive RICO offenses, all the while knowing about, and agreeing to, the overall objective of the fraud—generating exorbitant compensation for himself. By his unlawful actions, therefore, he (i) conducted and/or participated in the affairs of USPM and/or SCI (in violation of 18 U.S.C. § 1962(c)) and/or (ii) conspired with others (the identities of whom are only known by them at this stage in the

litigation) to violate 18 U.S.C. § 1962(b); (c) (in violation of 18 U.S.C. §1962(d)), and defrauded the elderly Norris couple(and possibly other customers) in the process.

22.     The RICO Defendant caused the RICO and RICO-AIF Enterprises to engage in this fraudulent scheme with the intent, *inter alia*, to (i) shift the burden of proof to the elderly Norris couple knowing they do not have unlimited resources and has limited knowledge, and (ii) generate exorbitant compensation for himself. The RICO Defendant's wrongful actions and fraudulent scheme constitute mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341; 1343.

23.     The multiple, repeated and continuous acts of mail fraud and/or wire fraud described in Paragraphs 15 and 16 (above) constitute a pattern of unlawful activity under 18 U.S.C. § 1961(1); (5).  Nothing about the RICO Defendant's schemes to defraud the elderly Norris couple indicated that the schemes would ever terminate.  Moreover, and independent of the duration of the scheme, his wrongful acts were a consistent, regular and dominant part of the manner in which he participated in, conducted the day-to-day business and financial affairs of the RICO Enterprises (USPM and/or SCI), and the RICO-AIF Enterprise.

### COUNT II
### VIOLATION OF 18 U.S.C. § 1962(c)
### (As Against RICO Defendant CAMP)

24.     The preceding factual statements and allegations are incorporated by reference.

25.     USPM and/or SCI are each an "enterprise" engaged in, and the activities of which affected, interstate commerce within the meaning of 18 U.S.C. §§ 1961(4); 1962(c); 1962(d).

26.     USPM  and SCI, together, form a "RICO Association-in-Fact Enterprise" engaged in, and the activities of which affected, interstate commerce within the meaning of 18 U.S.C. §§ 1961(4); 1962(c); 1962(d).

17

27.     Nathan Camp ("Camp") is a "person" within the meaning of 18 U.S.C. §§ 1961(3); 1962(c); 1962(d).

28.     Camp conducted and/or participated in the business and financial affairs of USPM (the RICO Enterprise),and SCI (RICO Enterprise), and the RICO-AIF Enterprise through patterns of unlawful activity within the meaning of 18 U.S.C. §§ 1961(1)(B); 1961(5); 1962(c); to wit, the multiple, repeated and continuous acts of mail fraud and wire fraud, in violation of 18 U.S.C. §§ 2; 1341; 1343, set forth above.

29.     The patterns of unlawful activity and corresponding violations of 18 U.S.C. § 1962(c) (*see* Paragraphs 14-16, above) by Camp proximately and/or directly caused the elderly Norris couple to suffer injury to their business and/or property within the meaning of 18 U.S.C. § 1964(c); to wit, the elderly Norris couple were damaged by, *inter alia*, the fraudulent and inflated prices they paid for the above-listed coins, consequential damages related to the funds they used to purchase the coins, and the corresponding mental anguish Vincenta Norris suffered.  Camp committed these substantive RICO offenses by using USPM (the RICO Enterprise), and/or SCI (RICO Enterprise), and the RICO-AIF Enterprise to engage in multiple predicate acts of mail fraud and wire fraud, all the while knowing about, and agreeing to, the overall objective of the mail fraud—generating exorbitant compensation for himself. He knew his tactics and marketing practices were misleading and unlawful and would cause the elderly Norris couple to suffer damages that were reasonably foreseeable by them and/or anticipated as a substantial factor and a natural consequence of their pattern of unlawful activity.

## COUNT III
## VIOLATION OF 18 U.S.C. § 1962(d) BY
## <u>CONSPIRACY TO VIOLATE 18 U.S.C. § 1962(c)</u>
### (As Against RICO Defendants CAMP)

**30.**     The preceding factual statements and allegations are incorporated by reference.

**31.**     USPM and SCI are each an "enterprise" that was engaged in, and the activities of which affected, interstate commerce within the meaning of 18 U.S.C. §§ 1961(4); 1962(c); 1962(d).

**32.**     Collectively, USPM and SCI are a "RICO Association-in-Fact Enterprise" engaged in, and the activities of which affected, interstate commerce within the meaning of 18 U.S.C. §§ 1961(4); 1962(c); 1962(d).

**33.**     Nathan Camp ("Camp") is a "person" within the meaning of 18 U.S.C. §§ 1961(3); 1962(c); 1962(d).

**34.**     Camp conspired with other persons (the identities of whom are only known by them at this stage in the litigation) within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(c); that is, they conspired to conduct and/or participate in the business and financial affairs of USPM (the RICO Enterprise) and SCI (RICO Enterprise), and the RICO-AIF Enterprise through a pattern of unlawful activity within the meaning of 18 U.S.C. §§ 1961(1)(c); 1961(5); and 1962(c); to wit, the multiple, repeated and continuous acts of mail fraud and wire fraud, in violation of 18 U.S.C. §§ 2; 1341; 1343, set forth above.

**35.**     RICO Defendant's pattern of unlawful activity and corresponding violations of 18 U.S.C. § 1962(d) proximately and/or directly caused the elderly Norris couple to suffer injury to their business and/or property within the meaning of 18 U.S.C. § 1964(c); to wit, the elderly Norris couple was damaged by, *inter alia,* the fraudulent and inflated prices they paid for the above-listed coins.   The RICO Defendant, through his representatives agreed to commit these substantive RICO offenses by using the USPM (the RICO Enterprise) and/or SCI (RICO Enterprise), and the RICO-AIF Enterprise, to engage in multiple predicate acts of mail fraud and

wire fraud, all the while knowing about, and agreeing to, the overall objective of the mail fraud—generating exorbitant compensation for himself. He knew his tactics and marketing practices were misleading and unlawful and would cause the elderly Norris couple to suffer damages that were reasonably foreseeable by him and/or anticipated as a substantial factor and a natural consequence of his patterns of unlawful activity.

## COUNT IV
## FRAUDULENT INDUCEMENT

36.     The preceding factual statements and allegations are incorporated herein by reference.

37.     Under Texas law, the essential elements of a cause of action for fraudulent inducement are: (1) a material misrepresentation, (2) made with knowledge of its falsity or asserted without knowledge of its truth, (3) made with the intention that it should be acted on by the other party, (4) which the other party relied on and (5) which caused injury.

38.     Defendants, by and through the USPM and/or SCI salespersons, utilized one or more of the above unlawful, false, misleading, and unconscionable sales tactics to fraudulently induce the elderly Norris couple into the purchases of the over-priced coins. Specifically, Defendants, by and through their employees intentionally and fraudulently induced the elderly Norris couple by: misrepresenting material facts which Defendants knew were false at the time they were made with the intent to induce the elderly Norris couple into purchasing the coins for the benefit of the Defendants and at the expense of the elderly Norris couple; misrepresenting that the price paid for the coins was a current fair value of the coins with full knowledge that the coins were not worth a fraction of the value at which they were sold and purchased; misrepresenting that historically the "investment grade" coins realize significant returns, which they do not; misrepresenting that the "certification" adds a substantial value to the coins when it does not; misrepresenting that it takes years for a return on investment of the "investment grade" coins to

occur, when such return does not occur; misrepresenting that the elderly Norris couple will be able to market their coins for a price similar to Defendants' pricing, which they cannot ethically do; and other misrepresentations that may be exposed during discovery.  Defendants, by and through their salespersons, made the above false representations to the elderly Norris couple with the intent to induce the elderly Norris couple into entering the contracts to purchase the coins. Plaintiffs relied upon these misrepresentations to make the initial purchases resulting in substantial losses at the moment of sale.

39.     Defendants, by and through the USPM and/or SCI salespersons, continued their fraudulent inducement after the original purchases by providing false and misleading sales marketing data through their publications and verbal misrepresentations to continue to entice the elderly Norris couple into buying coins with the intent to induce them into buying more over-priced coins. Defendants made those representations with full knowledge that such representations were false when made with the intent to induce the elderly Norris couple to purchase the grossly overvalued coins which, in fact, they purchased to their financial detriment and Defendants' financial gain. As a direct and/or proximate result of Defendants' false and misleading representations about the overvalued coins, Plaintiffs suffered (and continues to suffer) damages in the form of, *inter alia,* the amounts paid to Defendants for the bullion coins in excess of their value and mental anguish damages.

40.     Defendants, by and through the USPM and/or SCI salespersons, committed the tort of fraudulent inducement in their verbal sales pitches to the elderly Norris couple regarding "certified coins" and numismatic coins; through the falsehoods, half-truths, and omissions in their written promotions; and, through the errant and misleading website that published an inaccurate and false representation of the market value of the coins. Moreover, Defendants' false

representations and/or omissions were made knowingly and intentionally or, at the very least, in reckless disregard of Plaintiff's rights and interests.

41.     Because Plaintiff justifiably relied upon Defendants' material misrepresentations and would never have entered into any contract with Defendants to purchase the coins at issue absent those misrepresentations, Defendants' wrongful actions constitute fraudulent inducement at Texas common law.

## COUNT V
## FRAUD AND/OR FRAUDULENT CONCEALMENT

42.     The preceding factual statements and allegations are incorporated herein by reference.

43.     In order to sell the overvalued coins to the elderly Norris couple, Defendants utilized one or more of the above unlawful, false, misleading and unconscionable high-pressure sales tactics typical of the precious metals/coins/bullion direct sales industry.  Specifically, Defendants and their employees falsely and/or misleadingly represented to the elderly Norris couple that they were a preferred customer, the elderly Norris couple "needed the coins," the elderly Norris couple were "getting a good deal," and the elderly Norris couple "would not lose any money" on the purchases. Defendants and their employees also falsely represented the current value of the coins with full knowledge that the coins were not worth the value at which they were purchased nor will the coins attain the return of investment as promised.

44.     Defendants, by and through their salesmen, made the above false representations to the elderly Norris couple with the intent that they rely upon them and with full knowledge that such representations were false when made. The elderly Norris couple relied on Defendants' material and false representations when deciding to purchase the grossly overvalued coins which, in fact, they purchased to their financial detriment and Defendants' financial gain.  As a direct and/or

proximate result of Defendants' false and misleading representations about the overvalued coins, the elderly Norris couple suffered (and continue to suffer) damages in the form of, *inter alia,* the amounts paid to Defendants for the gold coins in excess of their value, consequential damages and mental anguish damages.

**45.**     By virtue of the confidential business relationship between Plaintiffs and Defendants, Defendants had a duty to disclose the above concealed material facts to Plaintiffs.  Their deliberate silence, when they had a duty to speak, and the resulting nondisclosure of the above concealed material facts, is the equivalent of false representations and/or omissions.  Such false representations and/or omissions were made knowingly and intentionally or, at the very least, in reckless disregard of Plaintiffs' rights and interests.

**46.**     Plaintiff justifiably relied on Defendants' false representations and/or omissions to theirs financial detriment by purchasing the grossly overvalued coins. Defendants' wrongful actions constitute fraud at Texas common law.

**47.**     Defendants concealed their wrongful actions with the intent to mislead and defraud Plaintiffs. Plaintiffs were not aware of, nor, through the exercise of due diligence, could have become aware of Defendants' wrongful actions until such wrongful actions brought to light by third parties.  Due to the Parties' confidential business relationships, which were predicated on their mutual trust and confidence, and Defendants' superior knowledge and/or means of knowledge, Defendants had a duty to disclose to Plaintiffs the above materially false information.  Defendants' failure to do so constitutes fraudulent concealment at Texas common law.

## COUNT VI
## <u>NEGLIGENT MISREPRESENTATION</u>

**48.**     The preceding factual statements and allegations are incorporated herein by reference.

**49.**     Defendants made certain representations to Plaintiffs in the course of their business and in transactions in which Defendants had a substantial monetary interest.  Defendants also supplied false information for the specific purpose of guiding Plaintiffs in their purchase of the grossly overvalued coins.

**50.**     Defendants, however, failed to exercise reasonable care and competence in obtaining and communicating such information to Plaintiffs by, *inter alia,* utilizing one or more of the above unlawful, false, misleading and unconscionable sales tactics typical of the precious metals/coins/bullion direct sales industry and/or making the above false and material misrepresentations and omissions.

**51.**     The elderly Norris couple justifiably relied on Defendants' negligent misrepresentations when purchasing the grossly overvalued coins, which directly and/or proximately caused them to suffer damages to the financial benefit of Defendants. The elderly Norris couple continued to justifiably rely upon Defendants' negligent misrepresentations in their oral representations, its websites, and its various print advertisements regarding the grossly overvalued coins, which directly and/or proximately caused them to suffer damages to the financial benefit of Defendants. Defendants' wrongful conduct constitutes negligent misrepresentation at Texas common law.

## COUNT VII
## <u>NEGLIGENCE</u>

**52.**     The preceding factual statements and allegations are incorporated herein by reference.

53.     Defendants negligently valued, promoted, marketed, advertised and sold grossly overvalued coins to Plaintiffs. In doing so, Defendants owed a duty to Plaintiffs to exercise reasonable care in valuing, promoting, marketing, advertising and selling the coins. Defendants breached their duty to Plaintiffs by failing to exercise reasonable care in valuing, promoting, marketing, advertising and selling the coins to Plaintiffs. Defendants' wrongful conduct directly and/or proximately caused the elderly Norris couple to suffer damages. Defendants' wrongful conduct constitutes negligence at Texas common law.

**COUNT VIII**
**VIOLATIONS OF THE TEXAS DECEPTIVE**
**TRADE PRACTICES-CONSUMER PROTECTION ACT**

54.     The preceding factual statements and allegations are incorporated herein by reference.

55.     Plaintiff Vincenta Norris is a "consumer" under the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA"), pursuant to Section 17.45(4) of the Texas Business and Commerce Code.  Defendants are "persons" that may be sued under the DTPA, pursuant to Section 17.45(3) of the Texas Business and Commerce Code.

56.     By their above wrongful acts and/or misrepresentations, Defendants engaged in false, misleading and deceptive acts and practices in violation of Sections 17.50(a)(1) and 17.46(b) of the Texas Business and Commerce Code to wit, Defendants, *inter alia:* (i) represented that the coins have value that they do not have and that significant investor and collector demand exists for the coins that will cause them to appreciate in value, which does not exist and will not happen (Section 17.46(b)(5)); (ii) represented that the coins are rare and/or unique and have substantial desire to investors and collectors, which will cause the coins to appreciate significantly in the future, which they are not (Section 17.46(b)(7)); and, (iii) failed to disclose the above

25

information about the coins, which Defendants knew at the time of the transactions, with the intent to induce Plaintiff Vincenta Norris to purchase the coins that Plaintiff would not have purchased had Defendants disclosed such information (Section 17.46(b)(24)). Plaintiff Vincenta Norris relied on Defendants' misrepresentations and omissions in purchasing the coins to her financial detriment.

57.     By their above wrongful acts and/or misrepresentations, Defendants also violated Section 17.50(a)(2) of the Texas Business and Commerce Code by breaching the implied and/or express warranties they made to Plaintiff Vincenta Norris that the coins have value and that significant investor and collector demand exists for the coins that will cause them to appreciate significantly in value.

58.     By their above wrongful acts and/or misrepresentations, Defendants also violated Section 17.50(a)(3) of the Texas Business and Commerce Code by engaging in unconscionable actions and/or an unconscionable course of action because such wrongful acts and practices took advantage of Plaintiff Vincenta Norris' lack of knowledge, ability, experience and/or capacity to a grossly unfair degree to Plaintiff Vincenta Norris' financial detriment.

59.     Plaintiff Vincenta Norris seeks damages for mental anguish and treble economic damages under the Texas Business and Commerce Code, Sections Section 17.50(b)(1) because the conduct of the Defendants was committed knowingly and intentionally.

60.     Defendants also violated the DTPA for failing to comply with Texas Business and Commerce Code, Sections 302.101, 302.105, 302.151(11)-(16), 302.152, and 302.153(a). Pursuant to Section 301.104, Plaintiff Vincenta Norris is entitled to damages "*not be less than the amount the consumer paid the person who sold the consumer goods or services through the use of the telephone solicitor, plus reasonable attorney's fees and court costs.*" Accordingly,

Plaintiff seeks recovery of One Hundred Fifty-five Thousand, Seven Hundred Thirty-five and 00/100 Dollars ($155,735.00), plus reasonable attorney's fees, and court costs. Plaintiff seeks treble damages pursuant to Section 302.303 and Section 17.50.

## COUNT IX
## CONSPIRACY

**61.**     The preceding factual statements and allegations are incorporated herein by reference.

**62.**     Defendants (and possibly others), either working together as a combined group or in sub-combinations of two or more, affirmatively conspired to engage in the wrongful actions set forth above.   By doing so, Defendants conspired to accomplish an unlawful purpose or a lawful purposed by an unlawful means.   As such, Defendants conspired to commit the wrongful actions outlined in Counts I-IV, above, all of which directly and proximately caused Plaintiffs to sustain actual and consequential damages.   Defendants' wrongful actions constitute civil conspiracy at Texas common law.

## COUNT X
## MONEY HAD AND RECEIVED

**63.**     The preceding factual statements and allegations are incorporated by reference.

**64.**      By their above-described wrongful actions and/or inaction, Defendants hold money obtained by a) the wrongfully charged and collected purchase prices paid by the elderly Norris couple for the grossly overvalued coins misrepresented and sold to them by Defendants; and b) coins impermissibly sold to third parties and the funds retained without payment to the elderly Norris couple or replacement of their coins, that, in equity and good conscience, belongs to the elderly Norris couple.   Defendants, therefore, should be compelled to refund such wrongfully charged and collected funds under the equitable doctrine of money had and received.

27

## COUNT XI
## UNJUST ENRICHMENT

**65.**     The preceding factual statements and allegations are incorporated herein by reference.

**66.**     Defendants (and possibly other persons and entities, including Defendants'. employees) have been unjustly enriched by (i) being paid an excessive value for coins that are not supported by any reasonable valuation; (ii) using the fraudulently obtained revenues and profits paid by the elderly Norris couple, and (iii) generating a return on the amounts described in (i) and (ii). Accordingly, the elderly Norris couple seeks to impose a constructive trust over (and recover) all amounts by which Defendants (and possibly other persons and entities, including Defendants' employees) have been unjustly enriched.

## ALTER-EGO

**67.**     Based upon information and belief, Nathan Camp ("Camp") uses various corporate forms as alter-egos and as mere tools or business conduits to shield assets and thus cause a diminution of available resources from which the elderly Norris couple may obtain satisfaction of the damages directly and/or proximately caused by Defendants' wrongful conduct.  All of these entities operate, directly or indirectly, under the same roof.  These entities shared employees, corporate leadership and were undercapitalized as they routinely sweep profits from the operations of USPM and SCI.   Upon information and belief, there are undocumented funds transfers between the corporations and/or partnerships; and there is an unclear allocation of profit and losses between these entities.  In short, the respective entities are substantially one and the same with Camp; and, the relationship between them is an illegitimate use of corporate form:

## RESPONDEAT SUPERIOR

**68.**     The preceding factual statements and allegations are incorporated herein by reference.

28

69.     Defendants also are liable for the above wrongful acts committed by their employees during the course and scope of their employment by the Defendants; to wit, the employees' wrongful conduct was committed (i) within their general authority, (ii) in furtherance of Defendants' business, and (iii) to accomplish the objective for which the employees were hired (*i.e*., selling overvalued coins to customers like Plaintiffs)—all of which directly and/or proximately caused Plaintiffs to suffer damages to the financial benefit of Defendants—under the doctrine of *respondeat superior.*

## **RELIEF REQUESTED**

70.     The preceding factual statements and allegations are incorporated herein by reference.

71.     **ACTUAL AND CONSEQUENTIAL DAMAGES.**  In the alternative, and as direct and proximate result of Defendants' wrongful conduct, Plaintiffs have suffered (and continues to suffer) damages in the form of, *inter alia*, the amounts paid to Defendants for the precious metal coins in excess of their value.  Plaintiffs are entitled to recover consequential damages related to lost investments when they were lured into purchasing the coins and the mental anguish they have suffered in connection with these transactions—in an amount to be determined by the trier of fact.  All conditions precedent to Plaintiffs' claims for relief have been performed and/or occurred.

72.     **PUNITIVE DAMAGES.**  Defendants' wrongful actions (and failure to disclose such wrongful actions) were committed intentionally, willfully, with malice and/or with conscious and/or reckless disregard for Plaintiffs' rights and interests.  Accordingly, Plaintiffs are entitled to an award of punitive damages against Defendants, both as punishment and to discourage such wrongful conduct in the future.  Punitive damages are not capped or limited because Defendants' wrongful conduct constitutes a felony under Section 32.46 and Chapter 31 of the Texas Penal Code. *See* Section

41.008(c) of the Texas Civil Practice and Remedies Code.  All conditions precedent to Plaintiffs' claim for relief have been performed and/or occurred.

73.    **TREBLE DAMAGES.**  Plaintiffs are entitled to treble damages for Defendants' knowing, willful and intentional wrongful conduct in violation of the RICO statute and the Texas DTPA, under 18 U.S.C. § 1964 (c) and Section 17.50(b)(1) of the TEXAS BUSINESS AND COMMERCE CODE.  All conditions precedent to Plaintiffs' claims for relief have been performed and/or occurred.

74.    **ATTORNEYS' FEES, LITIGATION EXPENSES AND COSTS.**  Plaintiffs are entitled to recover their reasonable and necessary attorneys' fees, litigation expenses and court costs in prosecuting this action pursuant to, *inter alia*, Chapter 38 and/or Chapter 42 of the Texas Civil Practice and Remedies Code and/or Section 17.50(d) of the Texas Business and Commerce Code.

**WHEREFORE,** Plaintiffs request that upon final trial or hearing, judgment be awarded against the Defendants, jointly and severally for:

A.   With respect to Counts I-III (violations of 18 U.S.C. § 1961, *et seq.*)—

    (1)    threefold the actual damages sustained by the elderly Norris couple with costs of suit, attorneys' fees, litigation expenses and court costs, all under 18 U.S.C. § 1964(c), with pre- and post-judgment interest at the highest legal rates; and

    (2)    equitable relief, as may be appropriate, under 18 U.S.C. § 1964(a), including an equitable accounting for all benefits, consideration and profits received, directly or indirectly, including imposing a constructive trust, the voiding of unlawful transfers, and the disgorgement of all ill-gotten gains and profits.

B.   With respect to Counts IV-XI:

    (1)    actual damages to be determined by the trier of fact;

    (2)    punitive damages;

(3)   treble damages;

(4)   all amounts by which Defendants have been unjustly enriched;

(5)   an equitable accounting for all benefits, consideration and profits received, directly or indirectly, by Defendants, including imposing a constructive trust, the voiding of unlawful transfers, and the disgorgement of all ill-gotten gains and profits;

(6)   pre- and post-judgment interest at the highest legal rates;

(7)   attorneys' fees and litigation expenses (investigative costs, deposition expenses, witness fees) incurred through the trial and any appeals of this case;

(8)   costs of suit; and

(9)   such other and further relief that the Court deems just and proper.

Respectfully submitted,

**STEVENS BALDO & LIGHTY, PLLC**
550 Fannin Street, Suite 700
Beaumont, TX 77701
(409) 835-5200
(409) 838-5638(f)


By: */s/ R. Lyn Stevens_____*
      R. Lyn Stevens
      State Bar No. 19189020
      stevens@sbl.law

**ATTORNEYS FOR PLAINTIFFS, VINCENTA NORRIS AND CHARLES D. NORRIS (PERSONAL REPRESETATIVE OF THE ESTATE OF JIMMY E. NORRIS)**